UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 7 |
| | : | |
| KENNETH WAYNE GRANGER | : | |
| f/d/b/a COMMUNITY HOME | : | |
| MORTGAGE, INC., | : | |
| f/d/b/a/ COMMUNITY INSURANCE & | : | |
| FINANCIAL SERVICES, INC., | : | |
| f/d/b/a MORNINGSTAR HOLDINGS, LLC,: | | |
| f/d/b/a/ MANUFIRST INVESTMENTS, | : | |
| LLC, | : | |
| | : | |
| Debtor | : | Case No. 06-52502 RFH |
| | : | |
| DR. THOMAS SHELTON AND | : | |
| DR. LOUIS SHELTON, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| KENNETH WAYNE GRANGER, et al., | : | |
| | : | Adversary Proceeding |
| Defendant | : | No. 07-5037 |

BEFORE

ROBERT F. HERSHNER, JR.
UNITED STATES BANKRUPTCY JUDGE

COUNSEL:

Plaintiffs:                    Ward Stone, Jr.
                               Christopher W. Terry
                               Fickling & Company Building
                               Suite 800, 577 Mulberry Street
                               Macon, Georgia 31201

Defendant:                     Jason M. Orenstein
                               Post Office Box 4086
                               Macon, Georgia 31208-4086

## MEMORANDUM OPINION

Louis Shelton and Thomas Shelton, Plaintiffs, filed with the Court on April 30, 2007, a Complaint To Determine Dischargeability of Debt. Kenneth Wayne Granger, Defendant, filed a response on May 7, 2007. Defendant filed a supplemental response on June 11, 2007. A trial on Plaintiffs' complaint was held on February 26 and 27, 2008. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Louis Shelton and Thomas Shelton (the "Sheltons") are 42 year-old brothers. The Sheltons are dentists who returned to Perry, Georgia in 1994 to establish their dental practice, Perry Dental Associates. Bristol Shelton is Thomas Shelton's wife. Bristol Shelton handles her family's finances and reviews the dental practice's finances.

Defendant is 43 years old and has lived in Perry, Georgia since 1993. In April 1994 Defendant formed Community Home Mortgage, Inc. ("CHM").[1] CHM was a Subchapter S corporation. Defendant initially was the sole shareholder of CHM. Defendant was the president of and managed the day-to-day operations of CHM. Defendant's mother, Anna Franklin, was the bookkeeper of CHM.

During its early years, CHM was in the business of originating residential

---

[1] CHM's 2003 tax return shows that it was incorporated on April 18, 1995.

mortgages, refinancing existing mortgages, and making home equity loans (collectively the "mortgages"). The mortgages were underwritten by third parties such as Wells Fargo. CHM later expanded into the business of selling and financing the purchase of manufactured homes.

Louis Shelton first met Defendant in 1994 at church. From time to time, they discussed church matters.

Around 2000 the underwriting guidelines for mortgages on manufactured homes changed. Defendant needed another investor to help with CHM's cash flow and operating expenses.

Dr. Dudley B. Christie, Jr. is an optometrist and a "businessman." In 2000 Dr. Christie purchased one-half of Defendant's shares of CHM's stock. The purchase price was $280,000. Dr. Christie intended for his purchase to be a short-term investment. Defendant retained the remaining shares of CHM's stock. Defendant continued to manage the day-to-day operations of CHM.

William Edgar Barfield, CPA, has been Dr. Christie's accountant since the early 1980s. After becoming a shareholder in CHM, Dr. Christie requested that CHM use Mr. Barfield as its accountant. Mr. Barfield was CHM's accountant from 2001 until March 2004. Mr. Barfield prepared tax returns and financial statements using information provided by CHM. The financial statements prepared by

Mr. Barfield were "compilation reports."[2] Mr. Barfield never audited CHM's financial records.

In 2001 Mr. Barfield discovered some accounting irregularities. CHM was making payments on loans which were not listed in its financial records. Mr. Barfield later discovered that CHM was "booking" as income the proceeds from loans obtained by CHM. This "covered up" a loss and made CHM's income and equity appear higher on its financial statements. Defendant told Mr. Barfield that a prior accountant had told him to do this. Mr. Barfield explained that this practice was not proper under generally accepted accounting practices ("GAAP"). Mr. Barfield testified that Defendant did not resist changing CHM's financial practices and that CHM's financial records were "cleaned up."

Mr. Barfield prepared a financial statement for CHM as of June 30, 2003. The financial statement shows CHM's total assets as $521,661[3] and paid in capital as $583,496.

In late 2003 Defendant asked Mr. Barfield to make financial recommendations for CHM. Mr. Barfield referred Defendant to Jan Young[4] who in turn referred

---

[2] A compilation is a presentation in proper form of financial information provided by the client. The accountant does not audit or verify the accuracy of information provided by the client. Black's Law Dictionary 302 (8th ed. 2004).

[3] All amounts have been "rounded down" to a whole dollar.

[4] Ms. Young is an employee of Mr. Barfield.

Defendant to Katrina O. Benton, a CPA who practices in Atlanta, Georgia.

Defendant met with Ms. Benton on December 12, 2003. Defendant asked her to "review everything." Ms. Benton gave Defendant a list of recommendations.

In response to Ms. Benton's recommendations, Defendant and Dr. Christie, as individuals, executed a promissory note dated December 20, 2003, in favor of CHM (hereafter the "promissory note"). The principal, $375,000, plus interest was due and payable on December 20, 2003.[5] Defendant and Dr. Christie never funded their loan to Defendant. CHM then executed a promissory note dated December 20, 2003, in favor of Defendant and Dr. Christie (hereafter the "reverse note"). The principal amount of the reverse note, $375,000, plus interest, was due and payable on December 20, 2006. CHM never funded its loan to Defendant and Dr. Christie. Mr. Barfield testified that it is "unusual for a company with no money to make a loan like this." The net effect of the promissory note and the reverse note was a "wash." No funds changed hands between CHM, Defendant, and Dr. Christie. Mr. Barfield testified that a $375,000 loan from CHM to Defendant and Dr. Christie would have been a material alteration and would have had a negative impact on CHM's financial statements.

Defendant met with Mr. Barfield on January 9, 2004. They discussed a number of financial matters. They discussed the "idea" of a shareholder investing more money in CHM and then immediately borrowing money from CHM. Mr. Barfield

---

[5] The promissory note was due and payable the same date that it was executed.

testified that he never knew about the reverse note that CHM had executed in December 2003. Mr. Barfield sent Defendant a letter dated January 14, 2004, in response to their meeting. In the letter, Mr. Barfield stated that an additional $750,000 of paid in capital would increase the net worth of CHM. Neither the promissory note nor the reverse note is mentioned in Mr. Barfield's letter. The Court, having considered the testimony presented and Mr. Barfield's letter, is persuaded that Mr. Barfield did not know about the reverse note.

On February 24, 2004, Defendant sent Ms. Young an e-mail that stated in part: "I just had the signed note, corporate resolution and affidavit sent to your office in regards to the loan made from me and Dr. Christie to Community Home Mortgage. Please take these documents and try to prepare a year-end financial statement for my review as soon as possible." Defendant sent Ms. Young a copy of the corporate resolution authorizing CHM to borrow $375,0000 from Defendant and Dr. Christie.[6]

Mr. Barfield terminated his services as CHM's accountant as of March 5, 2004. Mr. Barfield testified that CHM had sold certain property and distributed to Dr. Christie "a profit where a profit did not exist."[7] CHM failed to satisfy a loan on the property. Defendant told Mr. Barfield that "Everybody feels good when you

---

[6] Attached to Plaintiff's Exhibit 26 is a copy of the reverse note rather than a copy of the promissory note. Neither the Sheltons nor Defendant discuss this exhibit in their post-trial briefs.

[7] Defendant and a third party may also have received some of the profit.

6

distribute a profit so I did." Mr. Barfield testified that this "was in my line of thought a deliberate attempt to mislead [Dr. Christie]." When questioned why he believed this, Mr. Barfield testified "That's what Mr. Granger [Defendant] told me." Mr. Barfield did not want to be associated with Defendant. Mr. Barfield continued to serve as Dr. Christie's accountant in non-CHM matters.

Mr. Barfield did agree to prepare CHM's 2003 tax return which Defendant, as CHM's president, signed on April 2, 2004. The tax return, on page 4, shows CHM's total assets as of December 31, 2003, as $365,750 and "additional paid in capital" as $586,241. The promissory note and the reverse note which are dated December 20, 2003, are not shown on page 4, "Balance Sheet Per Books."

In March 2004 CHM retained Cary Baxter, CPA, as its accountant. Mr. Baxter prepared a financial statement as of April 30, 2004, for CHM.[8] The promissory note of $375,000 is shown under current assets as "N/R - Granger & Christie."[9] Total assets are shown as $734,598. The reverse note of $375,000 is not shown as a liability. Paid in capital is shown as $961,241. Mr. Baxter testified that he never knew about the reverse note. Mr. Baxter testified that the reverse note would have "negated" the $375,000 increase in current assets caused by the promissory note.

---

[8] All financial statements prepared by Mr. Baxter were compilation reports. Mr. Baxter testified that he had a copy of CHM's 2003 tax return when he prepared the April 30, 2004, financial statement.

[9] "N/R - Granger & Christie" represents the promissory note that Defendant and Dr. Christie executed in favor of CHM.

7

A comparison of CHM's 2003 tax return with its April 30, 2004, financial statement shows that CHM's total assets increased by $368,848 and that its paid in capital increased by $375,000. The Court is persuaded that the increases are due to the $375,000 promissory note.

Mr. Baxter prepared a financial statement as of June 30, 2004, that shows the promissory note as a current asset. The reverse note is not shown as a liability.

Defendant prepared a personal financial statement dated July 31, 2004. The financial statement shows Defendant's net worth as $1,919,902. Neither the promissory note nor the reverse note is shown on Defendant's financial statement.

Dr. Christie decided to terminate his investment in CHM. Dr. Christie always intended for his involvement to be a short-term investment. Dr. Christie wanted to sell his shares of CHM's stock and use the funds to help his son's real estate interests. Dr. Christie testified that there was no connection between his desire to sell his stock and any financial irregularities at CHM.

Defendant sent Louis Shelton an e-mail dated August 27, 2004, stating that there was an opportunity to invest in CHM and obtain a 50% ownership interest. In the e-mail, Defendant stated that CHM's financial statement dated June 30, 2004, showed total assets of $753,812, current liabilities of $419,923, long term liabilities of $164,340, equity of $169,548, and net income of $110,331.[10] Defendant stated that

---

[10] CHM's financial statement shows that it earned net income of $110,331 during the 6-month period ending June 30, 2004. Plaintiff's Exhibit 3.

the investment required was $597,000 and that the entire investment would be returned before any net profit distribution.  Defendant stated that the return of the initial investment was estimated at 12 months.  Defendant stated that the $597,000 could be paid as a cash investment or through a bank loan obtained by the investor.  CHM would service the debt on the bank loan until the obligation was paid in full.  Louis Shelton testified that the "numbers looked good, good equity and income."

In his e-mail, Defendant stated that the investment required was $597,000.  Defendant testified that $280,000 was needed to purchase Dr. Christie's shares of CHM's stock and that the remainder, $317,000, was to be working capital for CHM.

Defendant sent Louis Shelton another e-mail dated August 27, 2004, that stated in part: "It is a low risk, good, solid investment with high and fast return on investment (ROI)."  Louis Shelton sent Defendant an e-mail dated August 27, 2004, stating that he was interested but needed to talk with Defendant.

The next day, Louis Shelton told Thomas Shelton about the opportunity to invest in CHM.  Louis Shelton showed Thomas Shelton the e-mails that Defendant had sent.  The Sheltons have limited experience in investing and business matters other than operating their dental practice.  Thomas Shelton's wife, Bristol Shelton, is more knowledgeable in business and financial matters.  The Sheltons look to Bristol Shelton in financial matters.  Bristol Shelton testified that she understood the difference between an accounting compilation and an audit.

9

Louis Shelton and Bristol Shelton understood that Defendant was a good businessman who was involved in church and community affairs. Thomas Shelton and Bristol Shelton had obtained their home mortgage through CHM.

Most of Defendant's communications were with Louis Shelton who in turn shared the information with Thomas Shelton. Louis Shelton told Defendant that he was not able to invest the $597,000 that Defendant had requested in his first e-mail. Defendant "dropped" his request for the $317,000 which was to be working capital for CHM.

Defendant testified that he told Louis Shelton that CHM was a "highly risky business adventure," that CHM was in working-capital distress, to please take his time, and to talk to his wife and to Thomas Shelton. Louis Shelton denies that Defendant stated that CHM was in distress or that it was a "highly risky business venture." The Court, having considered the evidence and the testimony presented, is persuaded that Defendant represented that CHM was a solid low risk investment. The Court is persuaded that Defendant told Louis Shelton that CHM was a successful business, that its financial condition was "very good," that it would be profitable "going forward," and that its future was "very good."

Defendant met with the Sheltons on several occasions to discuss the CHM investment opportunity. Defendant also met at least once with Thomas Shelton and Bristol Shelton. The Sheltons and Bristol Shelton reviewed and discussed the

financial information on CHM that was provided by Defendant. The financial information on CHM showed a business similar in size to the Sheltons' dental practice. The Sheltons relied upon Defendant's representations that CHM was doing well and that CHM was a low risk opportunity. The Sheltons understood that CHM was a conservative investment. The Sheltons relied upon Defendant's religious representations to confirm his integrity.

The Court, from the testimony and evidence presented at trial, is persuaded that the Sheltons, in deciding to invest in CHM, also relied upon Defendant's e-mails dated August 27, 2004,[11] and CHM's financial statement as of June 30, 2004.[12]

Although the Sheltons would be purchasing Dr. Christie's shares of CHM's stock, the Sheltons never talked to Dr. Christie. All information concerning CHM came from Defendant.

The Sheltons decided to invest in CHM. Defendant sent Louis Shelton an e-mail dated September 8, 2004, in which Defendant makes numerous references to his religious beliefs.[13]

The Sheltons knew that Mr. Barfield had been CHM's accountant. The Sheltons knew that Mr. Baxter was CHM's current accountant. Mr. Baxter testified

---

[11] Plaintiff's Exhibits 1 and 40.

[12] Plaintiff's Exhibit 3. Bristol Shelton testified that she did not see this exhibit.

[13] The Sheltons do not question Defendant's religious beliefs. They testified, however, that they relied in part upon Defendant's religious representations in deciding to invest in CHM.

11

that if he had known about any irregularities at CHM, that he would have told Thomas Shelton.  The Sheltons did not talk to Mr. Barfield, Mr. Baxter, or Dr. Christie about the CHM investment opportunity.  The Sheltons did not seek advice from any other accountant.  The Sheltons did not request a financial audit of CHM.

On September 16, 2004, Dr. Christie sold his shares of CHM's stock to the Sheltons for $280,000.[14]  The Sheltons each paid $140,000 and each acquired 25% of the shares of CHM's stock.  The Sheltons obtained some of the funds they used to purchase Dr. Christie's shares by taking out personal loans with Capital City Bank.  Defendant continued to be the president of and was responsible for the day-to-day operations of CHM.  The Sheltons and Defendant had very few formal shareholder meetings.

Around September or October 2004, CHM entered the sub-prime mortgage business.  CHM began originating mortgages for customers who had "credit issues."

About two weeks after the Sheltons purchased Dr. Christie's shares, Defendant sent Louis Shelton an e-mail dated September 30, 2004.  Defendant outlined CHM's cash flow problems.  In his e-mail Defendant stated "There is no reserve account at this time."  Defendant stated that he had delayed giving out CHM's payroll.  Defendant stated "The sub-prime program is bringing in much business.  It will take

---

[14] Although Dr. Christie does not remember receiving any funds, the evidence shows that Dr. Christie received a check in the amount of $105,203.09.  The remaining $174,796.91 was paid to Capital City Bank to repay a loan owed by Dr. Christie.

us approximately 30 days before we recognize [any] increase [in] revenue and cash-flow from this new sub-prime business." Defendant's e-mail contained several religious references.

Defendant sent Louis Shelton an e-mail dated October 1, 2004. Defendant stated that he had not yet handled the payroll issues and that he was leaving the next day for Africa for 13 days. Defendant stated that CHM needed $44,700 for payroll and other expenses. Defendant stated "All will be good. No reason to panic or worry."

Mr. Baxter prepared a financial statement on CHM as of December 31, 2004, that shows the promissory note of $375,000 as a current asset. The reverse note is not shown as a liability.

Louis Shelton testified that from time to time, Defendant would approach him and request money, stating that this was a "downtime," that CHM needed to make payroll, and that loan closings were coming in. Louis Shelton contributed $60,593.76 in 2005 to help CHM meet its obligations. Thomas Shelton contributed $10,179.59 in 2005.

CHM was obligated on a number of loans which were owed to several lenders. Defendant told the Sheltons that the loans were secured by some 16 properties owned by CHM.[15] The monthly payments on the loans totaled $13,000. Defendant

---

[15] Defendant testified that two of the properties were in fact owned by him and his wife.

13

recommended that the loans be consolidated into a single loan with a monthly payment of about $9,600. Defendant stated that the properties generated monthly income of $12,000 which was sufficient to service the monthly payments on the proposed loan. Louis Shelton testified that he relied upon Defendant's representations and had no reason to doubt him. Thomas Shelton testified that he relied upon Defendant's representation that the income stream was sufficient to make the monthly payments on the proposed loan. Louis Shelton and Bristol Shelton testified that, based upon the representations made by Defendant, consolidation of the loans was a "no brainer." Defendant provided Capital City Bank with financial information on CHM for the proposed loan.

The "consolidation loan" closed on March 9, 2005. CHM executed a promissory note dated March 9, 2005, in favor of Capital City Bank. The principal, $1,041,356, plus interest, was to be repaid by making thirty-four monthly payments of $9,569 and a final payment of $927,314 on February 9, 2008. The obligation was secured by mortgages on properties owned by CHM. Defendant had provided financial information on CHM to Capital City Bank. At the closing, Gene Perkins, a loan officer for Capital City Bank, stated that CHM's "numbers looked strong." Louis Shelton testified that although he did not rely upon Mr. Perkins, that Mr. Perkins's statement made him feel good. The Sheltons and Defendant executed personal guarantees of the obligation. Some $963,912 of the loan proceeds were used to pay off CHM's

obligations on the properties that collateralized the new loan from Capital City Bank.[16] CHM received $63,502 at closing. Closing costs totaled $13,941.

Mr. Baxter prepared CHM's 2004 tax return and a Schedule K-1 for each of CHM's shareholders.[17] In April 2005 Defendant gave K-1s to the Sheltons for the 2004 tax year. The K-1s show that the Sheltons' share of ordinary business income was $7,738 each. Bristol Shelton asked Defendant why the Sheltons had "earned" this amount since they had been shareholders for only four months in the 2004 tax year. Bristol Shelton asked Defendant for a distribution check for Thomas Shelton's share. The Sheltons never received the distribution checks.

Around April 25, 2005, Defendant gave the Sheltons amended K-1s showing an ordinary business income loss of $1,995 each. The Sheltons and Bristol Shelton testified that this was the first time that they believed that CHM was having financial problems. Thomas Shelton testified that the amended K-1 was a "red flag." Mr. Baxter testified that after he had prepared the original K-1s, that he learned from Defendant that CHM had "booked" some $125,000 of loans as fee income. Mr. Baxter amended CHM's tax return. This changed CHM's profit to a loss. Mr. Baxter also amended the K-1s. Mr. Baxter testified that he told Defendant that the financial information given to Capital City Bank for the "consolidation loan" was not correct

---

[16] Only 14 properties are listed on the settlement statement.

[17] Schedule K-1 is used to report a shareholder's share of a Subchapter S corporation's income, deductions, and credits.